SPINMASTER, LTD. and STEVEN DAVIS
CORPORATION,

    Plaintiffs,

      v.

OVERBREAK LLC,

    Defendant.

No. 05 C 0860
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Spinmaster Ltd., maker of the Vectron Ultralite flying saucer toy, has filed for a preliminary injunction against Overbreak LLC to enjoin sales of Overbreak's HoverCopter flying saucer because it infringes upon their intellectual property. I find that there is a strong likelihood of success for Spinmaster on the merits of both the copyright and patent infringement claims, and irreparable harm to Spinmaster will result if Overbreak is not enjoined from selling their competing product. The balance of harms and the public interest also favor Spinmaster. Spinmaster's motion for a preliminary injunction is granted.

**Facts**

Plaintiff Steven Davis is a designer of flying toys. In 2002, he began designing a wireless, remote controlled flying saucer. The result of his work was the Vectron Ultralite, the remote control laser gun used to operate the toy, and a base station to charge the device, all of which was completed in 2003. Davis then partnered with Edu-Science, a Hong Kong based company, to coordinate the large-scale production of his toy and assigned Edu-Science some of the corresponding intellectual property rights. The Ultralite went on sale in retail stores in 2003

and received some publicity through television. It was nominated for "Most Innovative Toy of the Year" for 2003 by the Toy Industry Association, and received the "Certificate of Merit Award" from the Federation of Hong Kong Industries in 2003. By January of 2005, the Ultralite had sold more than 900,000 units.

At the 2004 New York Toy Fair, the defendant, Overbreak LLC debuted its new toy, the HoverCopter remote controlled flying saucer. At the Toy Fair, Mr. Davis confronted Tony Hu, Overbreak's Vice-President of Product Development, about the possible infringing aspects of the HoverCopter's design and informed him of the patents pending for the Ultralite. In addition, Davis sent cease and desist letters asking Overbreak to stop selling the allegedly infringing toys. Overbreak continued to market and sell the HoverCopter, insisting that it was not infringing on any of Davis' rights, and also designed the Turbo HoverCopter which it also intends to sell.

In May of 2004, Davis filed copyright applications for the flying saucer, controller and base station. Those applications were initially rejected, but subsequently approved by the Copyright Office, which issued the registrations on January 10, 2005. In addition, copyrights issued for the Ultralite instruction manual and a 2 dimensional design drawing on January 27, 2005 and February 5, 2005, respectively. In September 2004, the United States Patent and Trademark Office (the "PTO") issued Design Patent No. D496,695 to Davis, covering the Ultralite's ornamental design, and on May 31, 2005, Davis obtained Patent No. 6,899,586 (the "'586" patent) covering his description of a "self-stabilizing rotating toy."

In January of 2005, Davis reacquired all of the rights for the Ultralite from Edu-Science and made Spinmaster Ltd. the exclusive licensee for U.S. sales and distribution rights. Spinmaster and Davis then filed suit against Overbreak for copyright infringement and infringement of the '586 patent and have now filed a motion for a preliminary injunction to stop

Overbreak from selling the HoverCopter, Turbo HoverCopter, the controller, base station, and any other infringing products.

**Legal Standard**

A court may issue a preliminary injunction enjoining copyright or patent infringement if four conditions are met. First, the party seeking a preliminary injunction must pass the threshold tests of demonstrating a likelihood that they will ultimately succeed on the merits of the case and showing that irreparable harm will result if the injunction is denied. *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000). If the movant passes those two tests, the court must then consider any irreparable harm that will result to the defendant and whether the injunction is in the public interest. *See Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002); *Eli Lilly*, 233 F.3d at 461. Finally, the court should use a sliding scale approach to weigh all four of the factors against each other, so that the more likely that a plaintiff will succeed on the merits, the less the balance of harms needs to weigh in the plaintiff's favor. *Eli Lilly*, 233 F.3d at 461; *see also Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

**Likelihood Of Success On Copyright Infringement Claim**

I will start with Spinmaster's claim of copyright infringement against Overbreak under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq*. In order for a plaintiff to win a claim of copyright infringement, the plaintiff must show (1) ownership of a valid copyright, and (2) copying of original elements of the copyrighted work. *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991); *Incredible Techs., Inc. v. Virtual Techs.,*

*Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). Copying can be shown through direct evidence or by inference, if the copier had access to the copyrighted work and the accused work is substantially similar. *Incredible Techs.*, 400 F.3d at 1011. Substantial similarity consists of two questions: (1) whether the defendant copied the plaintiff's work, and (2) whether the copying constitutes an improper appropriation. *Id*.


**Ownership of a valid copyright**

The certificate of registration for a copyright issued within five years of the first publication of a copyrighted work is prima facie evidence of the validity of the copyright and any facts stated in the certificate. 17 U.S.C. § 410(c); *see also Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994). This shifts the burden of rebutting the presumption to the defendant in order to disprove validity. *See Wildlife*, 18 F.3d at 507. To prove their ownership of a valid copyright, Spinmaster has included their certificates of registration for the Ultralite, the infrared controller, and the base station, as well as a letter from the Examining Division of the Copyright Office. Overbreak has not challenged these documents or the existence of a valid copyright covering any protectible elements of the Ultralite. Instead, Overbreak focuses its efforts on showing that copyright protection does not cover the relevant aspects of the Ultralite's design at issue in this case. Therefore the copyrights are presumptively valid. Next I must determine what parts of the work the copyrights actually protect.


**The Basic Law of Copyright Infringement**

The Copyright Act limits the extent to which certain items may be protected from infringement. With respect to toys, only those toys which qualify as pictorial, graphic or

sculptural works are subject to copyright protection. *See* 1-2 *Nimmer on Copyright* § 2.18(H)(1).

Pictorial, graphic or sculptural works include "two-dimensional and three-dimensional works of

fine, graphic and applied art, photographs, prints, and art reproductions, maps, globes, charts,

diagrams, models and technical drawings, including architectural plans." 17 U.S.C. § 101.

Although the form of these articles may be copyrightable, if the item is useful, then the

mechanical and utilitarian aspects must be separated from the artistic aspects. *Id*. A useful

article is "an article having an intrinsic utilitarian function that is not merely to portray the

appearance of the article or to convey information." *Id*. Once an item is considered useful, it

may only be copyrighted as a pictorial, graphic or sculptural work to the extent that those features

can be separated from the functional features. *Id*.; *Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*,

372 F.3d 913, 920-21 (7th Cir. 2004). So, even if a defendant's product seems to infringe upon a

valid copyright, the court cannot find infringement with respect to any of the functional elements

of the copyrighted work. *Incredible Techs.*, 400 F.3d at 1012. "If an article is not 'useful' as the

term is defined in § 101, then it is a pictorial, graphic or sculptural work entitled to copyright

protection (assuming the other requirements of the statute are met)." *Pivot Point*, 372 F.3d at

919.


**The Application**

It is clear that the Ultralite was registered as a pictorial, graphic and sculptural work, so

Overbreak makes several arguments purporting to show the Ultralite's usefulness. First, it claims

that the Ultralite's purpose "is more than to portray the appearance of an article, its purpose is to

fly, and to do so with increased stability." This claim incorrectly tries to equate the Ultralite's

purpose with an aspect of its design. Its method of flight is certainly part of the draw of the toy,

and one of the qualities that makes playing with it unique, but it is quite clear that the Ultralite is

designed to portray a flying saucer.  The flight is only one part of that portrayal.  Overbreak's

second argument is that the value of the coordination skills children learn while playing with

these devices makes them useful.  This argument lacks merit.  While it may be true that the

Ultralite teaches some coordination skills, that same quality could be (and probably has been)

said of almost any toy.  A rule that considers any toy which helps to develop hand-eye

coordination to be useful would cause the usefulness exception to swallow the general rule

allowing copyrights for pictorial works.  *See, e.g.*, *Gay Toys, Inc. v. Buddy L. Corp.*, 703 F.2d

970, 973 (6th Cir. 1983).

　　　　Overbreak bases its main argument concerning the usefulness of the toy on the fact that

Davis has been issued a patent for the device in addition to Spinmaster's copyrights.  It argues

that, since a description of the hub and blades is included in the patent application, the toy must

have some intrinsic usefulness.  According to Overbreak, the only parts that are not separable

from the useful aspects are the parts detailed in the section concerning substantial similarity,

discussed *infra*.  I do not agree.  I will assume, for the moment, that the Ultralite should be

considered useful.  At that point I would be required to separate, whether physically or

conceptually, the functional aspects of the design from the artistic aspects, as described

extensively by the Seventh Circuit in *Pivot Point*.  It is quite clear that the mechanical parts of the

Ultralite--the motor and main propeller--are not entitled to copyright protection.  However, it is

at that point that I would draw the line between the functional and artistic aspects.  Without the

presence of the motor and propellor, the hub, blades and outer ring of the Ultralite do not have

any intrinsic usefulness.  That is the aspect of the Ultralite that should be ultimately be protected

by copyright, and over which Spinmaster has filed suit for infringement.  Therefore, I hold that

the portion of the Ultralite that is at issue with respect to copyright infringement is, in fact, protected by copyright. According to the same reasoning, the Ultralite controller and base are also protected.

**Access to Protected Work**

Instead of showing direct infringement, Spinmaster focuses on showing Overbreak's access to the Ultralite and the substantial similarity of the HoverCopter to the Ultralite.[1] "Broad public display of a product may give rise to an inference of access." *JCW Invs., Inc. v. Novelty, Inc.*, 222 F. Supp. 2d 1030, 1034 (N.D. Ill. 2002). The Ultralite had broad public display before the debut of the HoverCopter. The HoverCopter first appeared at the New York Toy Fair in February of 2004. Meanwhile, the Ultralite has been on sale since 2003, and was nominated for "Most Innovative Toy of the Year" in 2003 by the Toy Industry Association. Overbreak does not dispute any of these facts, which are by themselves sufficient to show access.

Additionally, Overbreak is not a new entrant into the toy industry, so it is more than likely they would have heard of a toy that garnered such acclaim. Indeed, it is clear from the exhibits that Overbreak, and Mr. Hu in particular, were very much aware of the existence and design of the Ultralite and had access to it while creating the HoverCopter. During discovery, Spinmaster obtained an Overbreak email including Mr. Hu as a recipient, in which a marketing executive asked an engineer to look into a product made by a company named "Vecron" that consisted of "essentially a round doughnut piece of Styrofoam with a blade inside that allows it to hover"

---

[1] Spinmaster does have some direct evidence of copying. When submitting an instruction manual to the FCC for approval, there is evidence that Overbreak may have directly copied the instruction manual for the Ultralite, replacing instances of "Vectron Ultralite" with the words "flying saucer." In once instance, Overbreak forgot to remove or change the words "Flying, hovering, and landing your Vectron Ultralite." While this might not be enough evidence to show copying of the Ultralite by itself, it certainly increases the likelihood of success.

(Pls.' Am. Mot. Ex. B). Spinmaster also submitted handwritten notes made by Mr. Hu from a meeting on January 21, 2004 which show Mr. Hu's understanding that it was "OK to look like Vectron," based on statements from Overbreak's president (Pls.' Am. Mot. Ex. G; Hu Dep. at 53). With this evidence, Spinmaster has sufficiently demonstrated a strong likelihood that Overbreak had access to the copyrighted work.

**Substantial Similarity**

Courts use the "ordinary observer" test to determine whether there is a substantial similarity that indicates infringement. The court must ascertain, "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Incredible Techs.*, 400 F.3d at 1011 (citing *Atari, Inc. v. North American Philips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982)). A work infringes if it captures the "total concept and feel of the copyrighted work." *Atari*, 672 F.2d at 614. Exact reproduction is not necessary to establish infringement, and minor and unimportant differences will not preclude a court from finding infringement using the objective observer test. *See Wildlife*, 18 F.3d at 511 (7th Cir. 1994); *Atari*, 672 F.2d at 618. At the same time, courts must keep in mind that, "the protection granted to a copyrightable work extends only to the particular expression of an idea, rather than the idea itself." *JCW Invs.*, 222 F. Supp. 2d at 1034.

Overbreak lists several differences between the HoverCopter and the Ultralite that do not dissuade me from considering them substantially similar. In particular, it lists the number of blades, the shape of the blades, the shape of the dome and the different color scheme as elements that differentiate the products. These differences are not sufficient. The importance of the

shapes of the domes and blades is minimal, because an ordinary observer is not likely to know the shape of one product's blade or dome without closely studying the toys, which is unlikely to happen. The different color scheme is immaterial because the Ultralite also comes in different colors other than black and silver. An ordinary person could simply think that the yellow and orange color of the HoverCopter is just another variation of the Ultralite, especially since the HoverCopter has a similar shading style, with one color only appearing along the upper edge of the blades. Looking at both products without any identifying labels, the number of blades is the only easy way to tell the two apart. Unfortunately for Overbreak, this small difference is not enough to detract from the "total concept and feel." While comparing the two products, there is no denying that Overbreak has "captured the total concept and feel" of the Ultralite rather than coming up with their own particularized expression of a flying saucer. So, notwithstanding the slight differences, I find a strong likelihood that Spinmaster can prove the substantial similarity of the HoverCopter to the Ultralite. As a result, Spinmaster has shown a strong likelihood of success in their copyright infringement claim.

**The Turbo HoverCopter and Derivative Works**

One of the "bundle of exclusive rights" that copyright holders possess is the right to make derivative works based on their original copyright. 17 U.S.C. § 106; *see also Stewart v. Abend*, 495 U.S. 207, 221 n.3 (1990). It follows directly that if a person does not own or license a copyright then they have no right to exploit that work. *Stewart*, 495 U.S. at 223. As a result, any changes in design that Overbreak has made or tries to make to the original infringing HoverCopter would necessarily also infringe on the Ultralite. *See Pickett v. Prince*, 207 F.3d 402, 406 (7th Cir. 2000) ("It is very difficult to see how a derivative work not made by the owner

of the original work could fail to infringe it, given the definition of derivative works").

Therefore, Spinmaster also has a likelihood of succeeding with an infringement claim against the

Turbo HoverCopter and any other derivative works.

**The Basic Law of Patent Claims**

At the preliminary injunction stage, the burden is on the patentee to show a likelihood of

success with respect to the validity of the patent and infringement by the defendant. *Nutrition 21*

*v. United States*, 930 F.2d 867, 869 (Fed. Cir. 1991). The patent holder is required to make a

"clear showing" of both factors. *See Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233

(Fed. Cir. 1985). However, even if the plaintiff carries that burden, if the defendant raises a

substantial question about validity or infringement, and the patentee cannot prove that the

question lacks substantial merit, then the preliminary injunction should be denied. *Helifix, Ltd. v.*

*Blok-Lok, Ltd.*, 208 F.3d 1339, 1351 (Fed. Cir. 2000). Once the patentee clearly shows both

validity and infringement with respect to at least one of the claims at issue, the court may balance

the competing equities and decide to preliminarily enjoin the defendant. *Atlas*, 773 F.2d at 1233.

The first step in determining both infringement and validity is that the court must first

determine as a matter of law the correct scope and meaning of the disputed claim terms. *See*

*Amazon.com*, 239 F.3d at 1351. However, a court is under no obligation to conclusively interpret

the claims at issue at an early stage of a case, such as for a preliminary injunction. *Sofamor*

*Danek Group, Inc. v. Depuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996). Claim

interpretation begins with the actual words of the claims. *Bell Communications Research, Inc. v.*

*Vitalink Communications Corp.*, 55 F.3d 615, 619-20 (Fed. Cir. 1995). Generally, the words,

phrases, and terms in patent claims should receive their ordinary and accustomed meaning.

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999); *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).  The strong presumption in favor of the ordinary meaning may only be overcome when the patentee clearly sets forth a definition for a claim term in the patent specification.  *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003) (*citing Johnson Worldwide*, 175 F.3d at 989-90).  "[A] technical term used in a patent claim is interpreted as having the meaning a person of ordinary skill in the field of the invention would understand it to mean."  *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001).  "Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (citations omitted).

The patent specification is the first resource, beyond the actual words of the claims themselves, used to aid in claim construction.  *Fromson v. Anitec Printing Plates, Inc.*, 132 F.3d 1437, 1442 (Fed. Cir. 1997).  In general, technical terms are deemed to have the same meaning in the claims as in the body of the specifications.  *Id.*  Additionally, I may review the specifications as an aid in determining the meaning of a claim term in the context of the entirety of the disclosed invention.  *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 231 F.3d 859, 866 (Fed. Cir. 2000).  In looking to the specifications, however, the claims are not limited to the embodiment shown there.  *Anchor Wall*, 340 F.3d at 1307; *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277 (Fed. Cir. 1995).  Limitations appearing only in the specifications cannot be read into a claim because "the claim, not the specification, measures the invention."

*Howes v. Zircon Corp.*, 992 F. Supp. 957, 961 (N.D. Ill. 1998) (*citing SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107 (Fed. Cir. 1985)).

Each patent has a corresponding publicly available record called the prosecution history that details the proceedings before the PTO.  This prosecution history may limit the interpretation of claim terms by excluding any interpretation that was disclaimed during prosecution to overcome or distinguish the prior art.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).  However, "unless altering claim language to escape an examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage." *Kopykake Enters. v. Lucks Co.*, 264 F.3d 1377, 1382 (Fed. Cir. 2001) (citations omitted).  Any such disavowal "must be clear and unmistakable." *Anchor Wall*, 340 F.3d at 1307.

Finally, "extrinsic" evidence such as expert testimony and the like may be considered only where the language of the claims remains ambiguous after consideration of the claim language, specification, and file history.  *Key Pharms., v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998).  "Extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language." *Vitronics*, 90 F.3d at 1584.

**The Application To "Portion" In The Patent Claim**

Although Overbreak does not explicitly state that it believes that the term "portion" is ambiguous, it is clear from the briefs that its interpretation of that term is at odds with Spinmaster's interpretation, and I must rule on how that term should be construed in the context of the claim.  Claims 1-3, 6 and 9 specifically refer to a flying toy containing a hub that has an "upper portion," a "lower portion," and a "center portion."  Spinmaster claims that the term

"portion" can refer to both separate parts as well as regions of a whole item. Overbreak argues that "portion" should only refer to a separate part, as if the patent said "separate portions" or "severable portions."

The Davis patent specification supports Spinmaster's interpretation. The specification contains two "embodiments" of the claimed device. The first embodiment has a hub with two separate parts, referred to as an "upper section," a "lower section," which are "received by an inner hub" (Davis, col. 2, lines 59-61). In the second embodiment, "the upper hub section and lower hub section are integrally formed as a single piece" (Davis, col. 5, lines 12-14). In both cases, the specification refers to two "sections," the only difference is that in one embodiment the two sections are received by an inner hub, while in the second there is no need for the inner hub because the two parts are already joined as an integral whole. Both parties agree that the patent claims the first embodiment from the specification, but then Overbreak attempts to ignore Davis' use of the exact same terms to describe the second embodiment. It can be inferred from Davis' use of "section" to refer to both embodiments and then his use of "portions" to refer to "sections" that he intended to adopt a similar meaning for the term "portion" in the actual claim as well.

Overbreak believes that the patent prosecution history supports its interpretation of "portion" because the original versions of claims 1, 6 and 12 submitted to the PTO only used the terms "upper" and "lower" portions, with no reference to a "center" portion.[2] Overbreak contends that this wording means that the claims initially only covered the second embodiment of the invention and, after speaking with an examiner, Davis changed the terms to describe "upper," "lower" and "center" portions in the final application. According to Overbreak, this

---

[2] Although Overbreak puts forth this argument toward the issue of infringement, discussed *infra*, it is more applicable to the claim construction, so I have addressed it here instead.

was done to correspond with the "upper" and "lower" sections and "inner hub" referred to in the first embodiment of the invention. In Overbreak's view, that change implies a conscious decision by Davis to claim only the first embodiment instead of the second. However, Overbreak has not raised any substantial question that this change was an attempt to escape rejection. It seems more likely that this was an attempt to improve the clarity of the description. Overbreak also is not able to show a clear disavowal of claim coverage by Davis; it may or may not be implied by the change in language, but an implication still would not meet the appropriate standard.

Dictionary definitions are considered extrinsic evidence. *Phillips*, 415 F.3d at 1318. Such extrinsic evidence should not be used to change the meaning of the claims, and may only be considered within the context of the intrinsic evidence. *Id*. at 1319. The common definition of "portion" (already recognized by the Federal Circuit) is, "a part of any whole, either separated from or integrated with it." *Random House Unabridged Dictionary* 1507 (2d ed. 1993); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001). "Hence, according to ordinary meaning, so long as a 'portion' of an object is a 'part' of that object, it can connote either the quality of being 'separate' or of being 'integral.'" *Rexnord*, 274 F.3d at 1344. This definition also supports Spinmaster's interpretation. Therefore, it is highly likely that I would construe the claims in the '586 patent to refer to an "upper portion," a "lower portion" and a "center portion" of a hub in which the "upper section" and "lower section" can be either separate parts received by an "inner hub," or parts of an integral whole.


**Infringement of the '586 patent**

To analyze infringement, the court must compare the construed claim to the accused item in order to determine whether the claim limitations are present. *Rexnord*, 274 F.3d at 1341. The only claim term in dispute concerns the term "portion." Since I have already preliminarily construed the claim to apply to a hub in which the terms "upper portion," "lower portion" and "center portion" apply to either separate parts or regions of an integral whole, I find that Spinmaster has clearly shown a likelihood that the HoverCopter infringes, and Overbreak has not raised a substantial question to rebut that showing. Overbreak also denies that its new Turbo HoverCopter infringes, arguing that there is no upper portion of the hub, but it is clear that the Turbo HoverCopter's hub has an upper portion, a center portion and a lower portion. As a result, Spinmaster has made a clear showing that the Turbo HoverCopter also likely infringes on at least claim 9 of the '586 patent.

Next, Overbreak argues that its HoverCopter and Turbo HoverCopter do not infringe because the hub configuration being used was disclosed and dedicated to the public. The "disclosure-dedication" rule states that, "subject matter disclosed in the specification, but not claimed, is dedicated to the public." *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1107 (Fed. Cir. 1996). This rule applies equally, regardless of whether the patentee is alleging infringement based on a theory of literal infringement or infringement by the doctrine of equivalents. *Id.* The basis of Overbreak's belief that the configuration was disclosed and dedicated is the change in the language during the approval process, but I have already construed the claim to encompass both embodiments in the patent specification. Overbreak has not raised a substantial question about infringement, so I find a likelihood of success on the merits of patent infringement for Spinmaster.

**Validity of the '586 Patent**

The main issue for validity at the preliminary injunction stage is the vulnerability of the patent claim during the actual trial on the merits. *See Amazon.com*, 239 F.3d at 1359. In order to obtain the injunction, the Plaintiff must be able to establish a clear case supporting validity. *Id*. Courts normally presume the validity of patents, which shifts the burden to the party challenging the patent. 35 U.S.C. § 282. Even though it is the patentee's burden to show a likelihood of success, it is still entitled to that statutory protection at this stage. *World Kitchen (GHC), LLC v. Zyliss Haushaltwaren AG*, No. 04 C 2999, 2004 U.S. Dist. LEXIS 26797 at *8 (N.D. Ill. Nov. 24, 2004). However, the alleged infringer is only required to "identify some persuasive evidence of invalidity" to defeat a preliminary injunction. *Pharmacia & Upjohn Co. v. Ranbaxy Pharms., Inc.*, 274 F. Supp. 2d 597, 601 (N.D. Ill. 2003). Despite this low threshold, Overbreak must still pose a substantial question of validity. If they are able to meet that burden then Spinmaster must prove that the invalidity defense lacks substantial merit. *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry.*, 357 F.3d 1319, 1334-35 (Fed. Cir. 2004).

Overbreak argues that the patent should be declared invalid due to obviousness. "A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art." 35 U.S.C. § 103. The determination of obviousness should be based on "(1) the scope and content of the prior art; (2) the differences between the prior art and the claims; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness." *Nat'l Steel*, 357 F.3d at 1334 (citing *Riverwood Int'l Corp. v. Mead Corp.*, 212 F.3d 1365, 1366 (Fed. Cir. 2000)). However, even if the prior art references collectively contain all of the limitations in the patent at issue, the patent is not necessarily invalid due to

obviousness. The defendant must show the existence of a motivation to combine all of those references at the time of the invention of the claimed patent. *Id*. at 1337. The reason for this requirement is so that courts do not label inventions that were not obvious at the time of creation as obvious when looking at them with the benefit of hindsight. *Id*.

Although it is customary for the court to begin by comparing the claims in the patent to those of the prior art, in this case it is not necessary to do so. Assuming for the moment that the prior art collectively contains all of the claims in the patent, Overbreak still has not shown any motivation to combine the three prior art references at the time of the '586 patent's invention. Therefore, it has not raised a substantial question about validity by rebutting the clear showing of validity that Spinmaster has made.

Overbreak claims that three prior art references anticipate the '586 patent: the McCroskey patent, Pat. No. 2,949,693, discloses a "Flying Toy;" the Rogers patent, Pat. No. 3,394,906, discloses a "Flying Saucer Structure;" and the Tilbor patent, Pat. No. 5,297,759, discloses a "Rotary Aircraft Passively Stable in Hover." All three of these prior art references were referenced by the PTO prior to approving the '586 patent. "A court is not bound by the PTO's actions and must make its own independent determination of patent validity. *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1322 (Fed. Cir. 2005). However, "[w]hen no prior art other than that which was considered by the PTO examiner is relied upon by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job. . . ." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984).

Overbreak quotes two sections from the Tilbor patent specification to suggest a motivation to combine the prior art. The first excerpt is as follows:

> However, a single one of the two propulsion devices 40 of
> sufficient power can rotate and lift aircraft 10 into the air.
>
> Preferably, each propulsion device 40 comprises a prime mover 42
> and a propeller 44 coupled with the prime mover 42 for rotation by
> the prime mover 42. More particularly, prime mover 42 may be an
> electric motor or gasoline engine with or without a transmission.

(Tilbor, col. 3, lines 49-57). I assume that Overbreak included this quote to show that Tilbor was

aware of electric motors that would be small and light enough to power the rotor assembly.

However, this quotation does not provide any motivation that would lead to the '586 patent. The

specification above is referring to an ordinary propeller that is attached to the top of at least one

of the blades in order to generate the rotation of the blades that provides lift. The specification

says nothing about placing such a motor in the hub and using it to power a propeller beneath the

blade assembly. There is no motivation to combine the prior art in that way.

Next, Overbreak points to another excerpt from the Tilbor specification which states that

its design may be used in other rotary aircraft construction, and can also be used in an aircraft

where the rotor is driven by a prime mover driving its hub (Tilbor, col. 9, lines 12-22). This

selection does not suggest any motivation to piece all the separate parts of all three prior art

references together. At most, the Tilbor excerpt suggests that the passive stabilization caused by

the downwardly turned tips of the blades could be a feature that is added to other structures that

contain a hub. There is no teaching in the Tilbor patent to add a set of propellers below the

Tilbor invention and no suggestion that the blades interact with a propeller located below the

blades. There is also no motivation to combine the required features from each of the three

pieces of prior art. Considering these three patents as sufficient to show a substantial question of

validity would be improperly "[using] hindsight reconstruction to pick and choose among

isolated disclosures in the prior art to deprecate the claimed invention." *Ecolochem, Inc. v. S.*

*Cal. Edison Co.*, 227 F.3d 1361, 1371 (Fed. Cir. 2000) (*citing In re Fine*, 837 F.2d 1071, 1075 (Fed. Cir. 1988)).  Therefore I do not find any substantial question about whether Spinmaster can prove validity.

**Irreparable Harm**

At the preliminary injunction stage, the burden on the plaintiff to show irreparable harm from copyright infringement is light.  *Midway Mfg. Co. v. Arctic Int'l, Inc.*, 547 F. Supp. 999, 1014 (N.D. Ill. 1982).  Also, "the stronger the case on the merits, the less irreparable harm must be shown."  *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1172 (7th Cir. 1997).  Copyright claims that show a likelihood of success entitle the holder to a rebuttable presumption of irreparable harm.  *See Atari*, 672 F.2d at 620.  Patent holders are also entitled to a presumption of irreparable harm after making a clear showing of validity and infringement.  *See Nutrition 21*, 930 F.3d at 871.  Based on the merit of both of Spinmaster's cases, its burden of showing irreparable harm is low.

Overbreak points out that it has ample cash reserves to pay a judgment award and argues that, due to the short life cycle of toys, Spinmaster would actually be better served by allowing Overbreak to continue making sales and then pay damages later if they lose.  This reasoning is not sufficient to rebut the presumption of irreparable harm.  Spinmaster has the right to protect their reputation as well as their sales from infringers.  *Midway*, 547 F. Supp. at 1014.  The availability and prevalence of cheaper copies of their product will also damage their goodwill by hampering their ability to sell derivative works that consumers will purchase because they already know and trust the brand.  This loss of goodwill is more applicable to trademark cases,

but it also applies to copyrights. *See Ty, Inc.*, 132 F.3d at 1173. It is unquantifiable and therefore irreparable.

**Balance of Harm to the Defendant**

Since Spinmaster has clearly passed the threshold requirements in order to obtain an injunction, next I will balance the harm that would be done to Overbreak by issuing an injunction with the harm that will befall Spinmaster if an injunction is not granted. Overbreak's only argument to tip the balance of hardships in their favor is their potential losses from their investment in inventory and the loss of goodwill as a result of being enjoined from fulfilling their orders. The lost profits from a surplus of inventory and loss of sales are monetary and not sufficient equitable consideration. *See Florists' Transworld Delivery, Inc. v. Originals Florist & Gifts, Inc.*, No. 00 C 4458, 2000 U.S. Dist. LEXIS 16869, at *10 (N.D. Ill. Nov. 9, 2000). Overbreak would not be entitled to any profits from their use of a protected copyright. *See id.* at *10. So, Overbreak's loss of goodwill as a result of their possible infringement is not sufficient to outweigh the loss of goodwill and other irreparable harms to Spinmaster. I find this factor weighs in favor of Spinmaster.

**Balance of Harm to the Public**

Finally, I must consider the harm that would befall the public if an injunction were granted. The public has an interest in "preserving the integrity of the copyright laws which seek to encourage individual effort and creativity by granting valuable enforceable rights." *Atari*, 672 F.2d at 620. Overbreak claims that the public would be better served by competition in this area, and points to the opinion in *Lear, Inc. v. Adkins*, 395 U.S. 653, 670 (1969), to suggest that patent

laws should be balanced against the benefit of full and free competition when there is no strong showing of infringement.  This argument would weigh against granting a preliminary injunction if Overbreak had shown Spinmaster was not likely to succeed with any of the two claims.  However, I have already found a very strong showing of copyright and patent infringement.  Allowing the infringement to continue pending a trial, even in cases where the Plaintiff has a strong likelihood of success, would actually run against the public interest by discouraging creativity due to the lack of protection of the creator's rights.  Therefore, I find that granting this injunction would be in the public interest.

Spinmaster will post a bond in the amount of $1,400,000.  The injunction is effective immediately, but due to the incomplete briefing on the amount of the bond, that amount may be subject to prompt reconsideration upon motion by either party.

For the reasons above, Spinmaster and Steven Davis' motion for a preliminary injunction is GRANTED.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: December 16, 2005